**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

RIVERKEEPER, INC.
Plaintiff,

v.

COEYMANS RECYCLING CENTER LLC, COEYMANS RECYCLING CENTER II, LLC, and CARVER LARAWAY
Defendants.

Case No. **1:24-cv-1333 (GTS/CFH)**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)

JURY DEMAND

Plaintiff Riverkeeper, Inc. ("Riverkeeper"), by and through its counsel, hereby alleges:

## I.

## INTRODUCTION

1. This is an action under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387, commonly known as the Clean Water Act ("CWA" or "the Act"), to address and abate Defendants' ongoing and continuous violations of the Act pursuant to the citizen suit enforcement provision of the Clean Water Act. 33 U.S.C. § 1365.

2. Defendants have discharged dredged or fill material into "waters of the United States," without a permit in violation of CWA Sections 301(a) and 404(a), 33 U.S.C. §§ 1311(a), 1344(a).

3. Specifically, Defendants have discharged material into wetlands and streams that are tributary to Coeymans Creek, a creek whose lower reaches run through Defendants' industrial park, which is located in the Village of Ravena and the Town of Coeymans, New York (the "Industrial Park"). They continue to do so.

4. Defendants have filled, and continue to fill, these wetlands and streams in the

process of building and expanding their Industrial Park.

5. Some of these wetlands and streams have been partly "impacted," and others are now completely buried beneath the Industrial Park.

6. The Industrial Park is located adjacent to Coeymans Creek, approximately 2,000 feet upstream from its confluence with the Hudson River. Within and adjacent to the Industrial Park are several unnamed tributaries to Coeymans Creek, as well as wetlands that are immediately adjacent and connected by continuous surface flow to these tributaries.

7. Defendants have been filling wetlands and streams in or near the Industrial Park without permits since at least 2013, when the United States Army Corps of Engineers ("Army Corps" or "USACE") conducted an inspection of the Industrial Park and discovered that Defendants had discharged fill into waters of the United States, including wetlands and several hundred feet of a stream tributary to Coeymans Creek, without a permit.

8. In 2019, Defendant Coeymans Recycling Center, LLC admitted to having filled additional wetlands after 2013 without a permit.

9. Specifically, in 2019, Defendant Coeymans Recycling Center, LLC submitted an application to the Army Corps for retroactive or "after-the-fact" coverage under a Clean Water Act § 404 permit (the "2019 Permit Application"). The 2019 Permit Application is attached to this Complaint as Exhibit B and is incorporated herein by reference.

10. Defendant Carver Laraway signed the 2019 Permit Application on behalf of Defendant Coeymans Recycling Center, LLC. Ex. B at #1239.11.

11. Defendant Coeymans Recycling Center, LLC, submitted the 2019 Permit Application to the Army Corps under cover of a letter prepared by Defendants' environmental engineering and compliance consultant, Ingalls and Associates, LLP ("Ingalls & Associates").

*Id*. at #1239.2–#1239.6.

12. The Ingalls & Associates cover letter begins by explaining that "Ingalls and Associates, LLP (*Ingalls*) is submitting this after the fact Nationwide Permit 39 (Commercial Development) permit application for disturbance to Waters of the U.S. at the Coeymans Industrial Park for Coeymans Recycling Center, LLC (CIP)". *Id.* at #1239.2.

13. The Ingalls & Associates cover letter identifies seven specific, mapped wetlands and three mapped streams that were "impacted" by Defendants' filling activities. *Id*. at #1239.3–#1239.4.

14. The cover letter identifies four of the impacted wetlands and three of the impacted streams as "jurisdictional." *Id*.

15. Ingalls & Associates' statement that these wetlands and streams are "jurisdictional" means that, in their view, these wetlands and streams are "waters of the United States" within the meaning of the Clean Water Act and, therefore, fall within the regulatory jurisdiction of the Army Corps.

16. The cover letter also states that "total waters of the U.S. impacts are approximately 0.98 acres." *Id*. at #1239.4.

17. Further, on the permit application form submitted by Defendant Coeymans Recycling Center and signed by Defendant Carver Laraway, Defendants checked the required box to indicate that a "Section 404 Clean Water Act" permit is required for the filling described. *Id.* at #1239.8.

18. Riverkeeper has conducted extensive reviews of public records in the possession of the New York State Department of Environmental Conservation ("DEC"), the United States Environmental Protection Agency ("EPA"), and the Army Corps. Riverkeeper has contacted

Army Corps staff to ensure the completeness of their files.

19. On information and belief, the Army Corps did not grant the 2019 Permit Application.

20. On information and belief, Defendants have never obtained coverage under a §404 permit from the Army Corps, or from DEC, for the discharges of fill material from the Industrial Park described in the 2019 Permit Application.

21. On information and belief, Defendants have never obtained coverage under a §404 permit from the Army Corps, or from DEC, for any discharges of fill material into waters of the United States at the Industrial Park.

22. Several of Defendants' discharges of fill material described in the 2019 Permit Application remain there to this day.

23. On information and belief, Defendants continued to fill wetlands and streams in or near the Industrial Park in recent months, without permission from the United States Army Corps of Engineers, even after they received Riverkeeper's notice that Defendants' filling activities violate the Clean Water Act and that Riverkeeper intends to file suit against Defendants.

24. Wetlands are an invaluable resource and provide essential beneficial services for people, fish and wildlife. They protect the health and wellbeing of the public by providing a buffer zone that protects the land from storm erosion and flooding.

25. Wetlands also protect water quality, serving as a natural filter, preventing pollution, sediment, and other contaminants from proceeding into groundwater or downstream into larger waterbodies.

26. In addition, wetlands are an integral part of the nutrient cycle and serve as critical

habitat for many species, as the benefits of land and water mix to form a unique community.

27. Wetlands thus also provide economic benefits, as many of the nation's fishing and shellfishing industries harvest wetland-dependent species. In addition, some medicines are derived from wetland soils and plants.

28. Wetlands also help to moderate global climate conditions by storing carbon within their plant communities and soil, instead of releasing it to the atmosphere as carbon dioxide.

29. Because of these unique characteristics, wetlands provide unique opportunities for education, research, and outdoor recreation, as well as valuable open space.

30. For many years, these public benefits of wetlands went unrecognized. As a result, more than half of New York State's historic wetland resources have been destroyed.

31. According to the Army Corps, "degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by [the Army Corps's] Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources." 40 C.F.R. § 230.1(d).

32. Defendants' filling of wetlands and streams that are tributary to Coeymans Creek contributes to the degradation of Coeymans Creek, its tributaries and connected wetlands, and the Hudson River, and substantially interferes with this important and valuable ecological resource.

## II.

## JURISDICTION AND VENUE

33. This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and

28 U.S.C. § 1331 (an action arising under the laws of the United States).

34. On August 28, 2024, Riverkeeper provided notice of Defendants' violations of the Clean Water Act and of its intention to file suit against Defendants to Defendants; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of the New York Department of Environmental Conservation ("DEC"), as required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3. A true and correct copy of Riverkeeper's notice letter is attached as Exhibit A, and is incorporated herein by reference (the "Notice Letter").

35. More than sixty days have passed since the Notice Letter was served on Defendants and the state and federal agencies in accordance with federal regulations. *See* 40 CFR 135.2. Thus, Riverkeeper has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

36. Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the Clean Water Act violations alleged in this Complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

37. This action is not barred by any prior administrative penalty under CWA Section 309(g), 33 U.S.C. § 1319(g).

38. Venue is proper in the United States District Court for the Northern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

**III.**

**PARTIES**

39. Plaintiff Riverkeeper, Inc. ("Riverkeeper") is a not-for-profit environmental organization organized under the laws of the state of New York, with its principal place of business in Ossining, New York. Riverkeeper's mission includes protecting and restoring the Hudson River from source to sea and safeguarding drinking water supplies through advocacy rooted in community, partnerships, science and law. In furtherance of that mission, Riverkeeper aims to inform its members and the public about developments that effect New York's wetlands and to protect the wetlands through various measures including submitting technical and legal comments on regulations and proposals that effect wetlands and working with state agencies to ensure future protection of wetlands for Riverkeeper's members. Riverkeeper has approximately 3,800 members in the New York region.

40. Riverkeeper's members are dedicated to the protection of the Hudson River, its tributaries such as Coeymans Creek, and the wetlands adjacent to these waters. Wetlands like those that Defendants are filling provide Riverkeeper's members with a variety of ecosystem services.

41. For example, wetlands absorb stormwater in large rains and thus provide flood protection to downstream communities. Many of Riverkeeper's members live downstream of Coeymans Creek along the Hudson River, in communities that are vulnerable to flooding.

42. Wetlands at and adjacent to the Industrial Park also absorb pollution, trapping it in sediments and preventing it from moving downstream into Coeymans Creek and, ultimately, into the Hudson itself.

43. The wetlands at issue in this case also provide vital habitat for a large range of wildlife including fish, insects, birds, amphibians, and many other animals that are vital to the

ecological integrity of the Hudson River ecosystem and, therefore, are vital also to the use and enjoyment of that ecosystem by Riverkeeper's members.

44. Riverkeeper's members use the Hudson River and its tributaries to fish, crab, sail, boat, canoe, kayak, swim, birdwatch, photograph, observe wildlife, engage in spiritual meditation, and engage in nature study and scientific study, among other activities. Defendants' discharges of fill material impair the value of Coeymans Creek, its tributaries and its wetlands, and the Hudson River for those uses.

45. Thus, Riverkeeper's members are harmed by Defendants' discharges of fill material from the Industrial Park. The interests of Riverkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act.

46. For example, one Riverkeeper member resides on a floodplain at the mouth of the Hannacroix Creek's junction with the Hudson River, which is hydrologically connected to Coeymans Creek. This member's use and enjoyment of her property is harmed by Defendants' degradation of the streams and adjacent wetlands tributary to Coeymans Creek. This member's property is part of the Coeymans-Hannacroix Complex, the area between Coeymans Creek and Hannacroix Creek, which is made up of interconnected wetlands and tributaries. She purchased her property specifically because of the environmental value of its riparian location to experiment with various land management methods of environmental restoration. This member values animals and plants that rely on wetlands habitats in the Hannacroix Creek and Coeymans Creek areas for food, shelter, and other essential services. The wetlands on and near her property are ecologically connected to wetlands nearby—birds, insects, and plants move and propagate between these nearby wetlands, and the wetlands together support interconnected populations of

wetland species. Defendants' degradation, and sometimes destruction, of vital wetlands habitats near this member's home thus threaten this member's efforts to restore riparian areas and their biodiversity.

47. This member is also concerned that, since wetlands filter pollutants, Defendants' filling of wetlands and streams in or near the Industrial Park increases harmful pollutants flowing downstream to her property, including pollutants from the Industrial Park. Those pollutants can enter her property particularly during flooding events, which are exacerbated by Defendants' filling of wetlands upstream. This member is thus harmed by Defendant's discharges of fill material into wetlands and streams tributary to Coeymans Creek.

48. Another Riverkeeper member resides in close proximity to Coeymans Creek and Hannacroix Creek, less than two miles from the Industrial Park. This member's use and enjoyment of the Hudson River and Coeymans Creek is harmed by Defendants' degradation of the streams and adjacent wetlands tributary to Coeymans Creek. This member is concerned that, because of the degradation of the wetlands and streams receiving pollution from Defendants' industrial operations, polluted waters will comingle with waters that this member and their family regularly rely upon. This member generally enjoys kayaking where Coeymans Creek meets the Hudson River and hiking along the Hannacroix Creek. For this member, knowing that these waters are polluted and otherwise harmed by Defendants' degradation of nearby wetlands and streams, is depressing and diminishes their enjoyment of recreating on and along the waters. This member is thus harmed by uncontrolled discharges of fill material from the Industrial Park to wetlands and streams tributary to Coeymans Creek.

49. The relief sought herein, including remediation of the harm Defendants have caused to these wetlands and streams, as well as cessation of any discharge of fill material, will

redress the harms to Riverkeeper and its members caused by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Riverkeeper and its members, for which harm they have no plain, speedy, or adequate remedy at law.

50. Riverkeeper brings this action on behalf of itself and its members. Riverkeeper's interest in stopping and undoing Defendants' illegal filling of federally protected wetlands adjacent to Coeymans Creek and its tributaries are germane to Riverkeeper's purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Riverkeeper.

51. Defendant Coeymans Recycling Center, LLC is a corporation, incorporated under the laws of the State of New York, that owns, built, and controls the Industrial Park.

52. Coeymans Recycling Center, LLC filled or caused the filling of federally protected wetlands and streams at and adjacent to the Industrial Park.

53. Defendant Coeymans Recycling Center II, LLC is a corporation, incorporated under the laws of the State of New York, that participates in ownership and control of a portion of the Industrial Park.

54. Coeymans Recycling Center II, LLC filled or caused the filling of federally protected wetlands and streams at and adjacent to the Industrial Park.

55. Defendant Carver Laraway is an individual residing in the State of New York who controls the development, design, and operation of the Industrial Park, owns and controls Defendant Coeymans Recycling Center, LLC and Defendant Coeymans Recycling Center II, LLC, and is a senior corporate officer of Defendant Coeymans Recycling Center, LLC and Defendant Coeymans Recycling Center II, LLC.

56. Defendant Carver Laraway caused the filling of federally protected wetlands and

streams at and adjacent to the Industrial Park.

57. Defendant Carver Laraway has signed at least one administrative consent order with the DEC on behalf of Defendant Coeymans Recycling Center, LLC and Defendant Coeymans Recycling Center II, LLC related to violations of state law governing the placement of fill material at the Industrial Park: Order on Consent R4-2018-1217-213, executed by Defendant Carver Laraway on January 18, 2019.

58. Defendant Carver Laraway is copied on and is a recipient of communications between the Defendant Coeymans Recycling Center, LLC and both the DEC and the Army Corps pertaining to Defendants' filling activities and the management of waterways within and near the Industrial Park.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

59. Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of this goal, the Act provides a comprehensive approach for the management of the waters of the United States. As relevant here, this approach includes protection of streams and wetlands from being filled-in or destroyed by construction projects.

60. Section 301(a) of the Act, 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant by any person shall be unlawful" unless the discharge complies with certain enumerated sections of the Act. 33 U.S.C. § 1311(a). The Act further defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. § 1362(12), and defines "navigable waters" to mean all "waters of the United States, including the territorial seas," 33 U.S.C. § 1362(7). In short, no person can discharge any

pollutant to any waters of the United States, unless the discharge complies with certain enumerated sections of the Clean Water Act.

61. Section 404 of the Clean Water Act, 33 U.S.C. § 1344, is a section of the Act under which the discharge of pollutants can be authorized, the general ban in Section 301 notwithstanding. Section 404 establishes a permitting program to control the discharge of "dredged and fill material" into U.S. waters.

**Section 404 Permits and Wetland Preservation**

62. To protect the integrity of our nation's waters, the Clean Water Act prohibits "the discharge of dredged or fill material" into waters of the United States without a permit. 33 U.S.C. §§ 1344(a), 1311(a).

63. Permits for the discharge of dredged or fill material are issued by the United States Army Corps of Engineers ("Army Corps") or by states that have been authorized by the Army Corps to act as fill-permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA. CWA § 404(d), (h), 33 U.S.C. § 1344(d), (h). New York does not have an Army Corps-approved CWA Section 404 plan in place. *See* 40 C.F.R. Part 233, subpart H (Approved State Programs) (listing only Michigan and New Jersey as having approved CWA § 404 plans).

64. New York State has independently recognized the value of its wetland resources, finding that wetlands are "invaluable resources for flood protection, wildlife habitat, open space, climate change mitigation . . . and water resources," yet "[c]onsiderable acreage . . . has been lost, despoiled or impaired by unregulated draining, dredging, filling, excavating, building, pollution or other acts inconsistent with the natural uses of such areas." N.Y. ENVTL. CONSERVATION LAW § 24-0105(1)–(2). The Freshwater Wetlands Act therefore declares that "the public policy of the state [is] to preserve, protect, and conserve freshwater wetlands and the

benefits derived therefrom." N.Y. ENVTL. CONSERVATION LAW § § 24-0103.

***Section 404 Permitting: Definitions***

65. Pursuant to CWA Section 404(a) and (d), 33 U.S.C. § 1344(a), (d), the Army Corps promulgated fill material discharge regulations at 33 C.F.R. Part 323.

66. CWA Section 404(a) and the Army Corps's implementing regulations require a permit for any activity that discharges dredged or fill material into the waters of the United States ("§404 permit"), with certain exceptions generally related to farming, silviculture, and ranching. 33 U.S.C. §§ 1344(a), (f); 33 C.F.R. §§ 323.3(a), 323.4.

67. The §404 permit regulations define the phrase "discharge of fill material" as "the addition of fill material into waters of the United States." 33 C.F.R. § 323.2(f). Among other examples provided, the "discharge of fill material" includes "site-development fills for recreational, industrial, commercial, residential, or other uses." *Id.*

68. The §404 permit regulations define "fill material" as any material that replaces any portion of a water of the United States with dry land or changes the bottom elevation of a water of the United States. 33 C.F.R. § 323.2(e)(1). Examples of fill material include "rock, sand, soil, clay, plastics, construction debris, wood chips, overburden . . . and materials used to create any structure or infrastructure in the waters of the United States." 33 C.F.R. § 323.2(e)(2).

69. The Clean Water Act protects wetlands that are adjacent to a waterbody that is a "water of the United States" in its own right and have a continuous surface connection with that waterbody. *Sackett v. EPA*, 598 U.S. 651, 678, 143 S. Ct. 1322, 1341 (2023) (citing *Rapanos v. United States*, 547 U.S. 715, 755, 126 S. Ct. 2208, 2234 (2006) (plurality opinion)) (interpreting "waters of the United States").

70. The §404 permit regulations define "waters of the United States" as:

> (1) Waters which are: (i) Currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (ii) The territorial seas; or (iii) Interstate waters; (2) Impoundments of waters otherwise defined as waters of the United States under this definition, other than impoundments of waters identified under paragraph (a)(5) of this section; (3) Tributaries or waters identified in paragraph (a)(1) or (2) of this section that are relatively permanent, standing or continuously flowing bodies of water; (4) Wetlands adjacent to the following waters: (i) Waters identified in paragraph (a)(1) of this section; or (ii) Relatively, standing, or continuously flowing bodies of water identified in paragraph (a)(2) or (a)(3) of this section and with a continuous surface connection to those waters; (5) Intrastate lakes and ponds not identified in paragraphs (a)(1) through (4) of this section that are relatively permanent, standing or continuously flowing bodies of water with a continuous surface connection to the waters identified in paragraph (a)(1) or (a)(3) of this section.

33 C.F.R. § 328.3(a); 33 C.F.R. § 323.2(a) (incorporating by reference).

71. The permitting regulations define "wetlands" as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(c). It goes on to define "adjacent" as "having a continuous surface connection." *Id.*

***Obtaining a §404 Permit***

72. Pursuant to CWA Section 404(b) and the §404 permit regulations, an application for the discharge of fill is evaluated by the Army Corps's District Engineer for "economic impact on navigation and anchorage" and for compliance with guidelines promulgated by EPA at 40 C.F.R. Part 230. 33 C.F.R. § 323.6(a). The purpose of the EPA guidelines in Part 230 is to ensure that the proposed activity "will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." 40 C.F.R. § 230.1(c).

73. Part 230 emphatically establishes that, "[f]rom a national perspective, the

degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources." 40 C.F.R. § 230.1(d).

74. Accordingly, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a); *see also* 40 C.F.R. § 230.5 (outlining general procedures to be followed under Part 230; highlighting the discharge restrictions at § 230.10).

75. Under Part 230, an application for a §404 permit must evaluate the activity's potential impacts on the biological, physical, and chemical characteristics of the aquatic ecosystem; potential impacts on special aquatic sites and human use; and actions to minimize adverse effects. 40 C.F.R. § 230.5(e), (f), (j); *see generally* 40 C.F.R. Part 230, subparts C–H (establishing minimum requirements for such evaluations). Part 230 also offers compensatory mitigation criteria, to guide the creation of additional, replacement waters where a fill project and its associated environmental damage is unavoidable. 40 C.F.R. Part 230, subpart J.

## **Citizen Enforcement Suits**

76. Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

77. Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342. CWA Section 505(f), 33 U.S.C. § 1365(f).

78. Declaratory relief in such cases is authorized by 28 U.S.C. §§ 2201–02 (granting U.S.

courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

79. Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

80. Violators of the CWA are also subject to an assessment of civil penalties of up to $66,712 per day per violation. CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

### The Industrial Park

81. Defendants own and control the Industrial Park.

82. The Industrial Park covers more than 250 acres of land located at Coeymans Industrial Park Lane and Village Industrial Park Road in the Village of Ravena and Town of Coeymans, New York, adjacent to Coeymans Creek.

83. The street address of the Industrial Park is provided in government records and online resources as 100 Coeymans Industrial Park Lane, Ravena, NY 12143.
The street address of the Industrial Park provided on the company's website, www.carvercompanies.com, is 181 Coeymans Industrial Park Lane, Coeymans NY 12045.

84. The Industrial Park occupies the following Albany County tax lots: 145.-2-41, 156.-2-1.11, 156.-3-1.1, 156.-4-6.1, 156.-4-6.2, 156.-4-6.11, 156.-4-6.12, 156.-4-6.14, 156.-4-6.171, 156.-4-12, 156.-4-6.13, 156.-4-14, 156.-4-6.15, 156.-4-6.16, 156.-4-6.172, 156.-4-8.1, 156.-4-10.1, 168.-2-1, 168.7-1-1.1, 156.-4-5, 168.7-1-1.2, and 168.8-1-4.

85. Ingalls and Associates, LLP ("Ingalls & Associates") has served as Defendants' environmental compliance consultant at the Industrial Park since at least 2013.

**The Industrial Park Contains Wetlands That Are Waters of the United States**

86. Several streams and unnamed tributaries to Coeymans Creek are located within and near the Industrial Park.

87. Coeymans Creek and its tributaries are "waters of the United States" as defined in 40 C.F.R. § 122.2 and, therefore, "navigable waters" as defined in CWA Section 502(7), 33 U.S.C. § 1362(7).

88. Multiple wetlands are adjacent and connected by continuous surface flow to these tributaries. These wetlands that are adjacent and connected to Coeymans Creek and its tributaries are also, therefore, "waters of the United States" as defined in 40 C.F.R. § 122.2 and, therefore, "navigable waters" as defined in CWA Section 502(7), 33 U.S.C. § 1362(7). *See* also *Sackett*, 598 U.S. 651.

89. A map authored by Ingalls &Associates, last updated November 1, 2019, is attached as Exhibit 1 to the Notice Letter and is incorporated herein by reference ("Trib Map"). The Trib Map shows the location of wetlands and tributaries identified by Defendants, highlighted by Riverkeeper in blue.

90. The Trib Map identifies, in a chart on the upper left-hand side, certain wetlands and tributaries as being "USACE Jurisdictional Waters of the United States." Defendants thus acknowledged and identified that, in their view, certain wetlands and streams within the Industrial Park are within the jurisdiction of the Army Corps because they are "waters of the United States."

91. On information and belief, the Trib Map does not identify all tributaries and wetlands that exist or have existed within or near the Industrial Park. On information and belief, neither the Army Corps nor DEC has ever made a jurisdictional determination as to any waters within or near the Industrial Park.

92. Additional facts, including details on the tributaries and wetlands that exist or have existed within or near the Industrial Park, are set forth in the Notice Letter that is attached to this Complaint as Exhibit A and incorporated by reference.

**Defendants Have Discharged Fill Material at the Industrial Park**

93. On information and belief, since at least 2013, Defendants have deposited fill material into tributaries of Coeymans Creek and their adjacent wetlands located in or near the Industrial Park.

94. On information and belief, fill material discharged to these navigable waters in or near the Industrial Park in 2015 or after has continuously remained in those waters since the date of discharge.

95. A map authored by Ingalls & Associates, updated on September 30, 2020, is attached as Exhibit 2 to the Notice Letter and is incorporated herein by reference (the "Updated Map"). The Updated Map shows wetlands and streams that Defendants identified or agreed are "impacted" (highlighted by Riverkeeper in red), purported remediation or reconstruction efforts and plans (highlighted by Riverkeeper in green), and contains waterbody labels (highlighted by Riverkeeper in blue).

96. The Updated Map identifies, throughout the Map and in a chart on the upper left-hand side, certain wetlands and streams as having been "impacted," as well as certain past or planned restoration efforts. Defendants thus acknowledged and identified certain impacts to jurisdictional wetlands and streams within and near the Industrial Park.

97. On information and belief, the Updated Map does not identify all impacts to waters of the United States within and near the Industrial Park. Further, on information and belief, the purported remediation or reconstruction efforts on the Updated Map have not occurred or have not been adequate.

98. Additional facts, including detail on Defendants' past and ongoing discharges of fill material to wetlands and streams within or near the Industrial Park, are set forth in the Notice Letter that is attached to this Complaint as Exhibit A and are incorporated herein by reference.

**Defendants Do Not Have Permit Coverage for these Discharges**

99. On information and belief, Defendants have never obtained coverage under a §404 permit from the USACE or from DEC for their discharges of fill material at the Industrial Park.

100. Defendants continued to fill wetlands and streams without a §404 permit after submitting their 2019 Permit Application, which was never granted.

101. Accordingly, on August 28, 2024, Riverkeeper sent all three Defendants, via certified mail, the Notice Letter.

102. On information and belief, Defendants have continued to fill wetlands and streams adjacent and connected to Coeymans Creek without a §404 permit even after receiving Riverkeeper's notice of intent to file this complaint.

103. On information and belief, as of the date of filing this Complaint, the Defendants have not obtained §404 permit coverage for their fill activities at the Industrial Park, nor have they removed the fill material from the impacted waters of the United States.

104. Defendants' violations of the Clean Water Act at the Industrial Park are ongoing, continuous, and capable of repetition.

## VI.

## CLAIMS FOR RELIEF

### First Cause of Action

***Unlawful Discharge of Pollutants***
***(Violations of CWA Sections 301 and 404, 33 U.S.C. §§ 1311 and 1344)***

105. Riverkeeper incorporates all preceding paragraphs as if set forth herein.

106. CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant by any person shall be unlawful" unless the discharge complies with certain enumerated sections of the CWA, such as obtaining coverage under a Section 404 permit for the discharge of fill material.

107. CWA Section 502(12), 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

108. CWA Section 502(12), 33 U.S.C. § 1362(12), defines "pollutant" broadly to include fill materials such as rocks and sand.

109. As outlined above, supra ¶ 68, "fill material" includes rock, soil, and construction debris, and a "discharge of fill material" includes site-development fills for use in commerce. 33 C.F.R. § 323.2(e)–(f).

110. CWA Section 502(14), 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

111. CWA Section 502(7), 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

112. As outlined above, supra ¶¶ 69–71, "waters of the United States" includes wetlands that are adjacent and have a continuous surface connection to other waters that qualify as waters of the United States, such as Coeymans Creek and its tributaries.

113. CWA Sections 301(a) and 404(a), 33 U.S.C. § 1311(a) and 1344(a), and the Army

Corps's implementing regulations found at 33 C.F.R. Part 323, require persons discharging dredged or fill material into a water of the United States to obtain a §404 permit.

114. Defendants have discharged and continue to discharge fill material from point sources into streams and wetlands located in or adjacent to the Industrial Park that are waters of the United States without a §404 permit.

115. Each and every day on which Defendants discharge fill material without authorization under a §404 permit is a separate and distinct violation of CWA Sections 301(a) and 404, 33 U.S.C. §§ 1311(a), 1344.

116. Each and every day on which Defendants allow their unpermitted and unlawful fill material to remain in a water of the United States is a continuing and ongoing violation of CWA Sections 301(a) and 404, 33 U.S.C. §§ 1311(a), 1344.

117. Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

118. Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

119. Wherefore, Riverkeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a. Declare all Defendants to have violated and to be in violation of the Clean Water Act as alleged herein;

b. Enjoin Defendants from further discharge of dredged or fill material into any wetlands, including the wetlands at the Industrial Park, and:

i. Order Defendants to immediately begin remediation and restoration of the wetlands at the Industrial Park; or

ii. Order Defendants to create additional replacement wetlands in accordance with 40 C.F.R. Part 230, subpart J, if remediation and restoration of the wetlands at the Industrial Park is unachievable;

c. Order Defendants to pay, jointly and severally, civil penalties, pursuant to CWA Sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1 through 19.4;

d. Order Defendants to pay the costs of litigation, including Riverkeeper's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

e. Award any such other and further relief as this Court may deem appropriate.

## VIII.

## JURY DEMAND

Riverkeeper hereby demands a trial by jury of all issues so triable.

Dated this 31st day of October 2024
New York, New York

Respectfully submitted,

By: /s/ Andie Altchiler______________

Andie Altchiler
SUPER LAW GROUP, LLC
222 Broadways, 22nd Floor
New York, NY 10038
*Attorney for Riverkeeper, Inc.*